137 N.J. Super. 155 (1975)
348 A.2d 219
FRANK D'ASCENSIO, CITY CLERK, PLAINTIFF,
v.
JAMES BENJAMIN, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided November 17, 1975.
*158 Mr. Milton A. Buck, attorney for plaintiff Mr. Salvatore Perillo, First Assistant Corporation Counsel, appearing).
Mr. Bernard K. Freamon, attorney for defendants.
KIMMELMAN, J.S.C.
Sometime during the fall of 1973 a committee was formed to press for the adoption of an ordinance establishing a civilian complaint review board in the City of Newark. The board would have jurisdiction over all complaints alleging misconduct on the part of the police. The committee enlisted the aid of some local law students to draw up a petition urging the adoption of the ordinance. Commencing in January 1974 the committee proceeded to circulate the petition for the purpose of gathering signatures sufficient in number to force a public referendum on the question. On June 6, 1975 the committee presented to the City Clerk of Newark for filing 258 petition forms purportedly signed by 21,119 registered voters. The requisite number of signatures of registered voters for the City of Newark for the current year pursuant to N.J.S.A. 40:69A-184(b) has been stipulated as 9,056. Whether the efforts of the committee have borne success is the issue now before the court.
The City of Newark having adopted a form of municipal government pursuant to the terms of the Faulkner Act, L. 1950, c. 210; N.J.S.A. 40:69A-1 et seq., is subject to the initiative and referendum provisions of N.J.S.A. 40:69A-184 et seq. These provisions sanction the only form of direct legislation allowed to the people in municipal affairs. The legislative scheme contemplates that the voters of a municipality may propose the passage of an ordinance by presenting the initiated ordinance to the municipal council *159 in the form of a petition signed by the appropriate number of registered voters. A referendum petition, on the other hand, seeks to have the voters reject at the polls an ordinance theretofore passed by the municipal council. It must also contain the same number of valid signatures. Unlike an initiative petition, a referendum petition must be promptly formulated and filed within 20 days after the passage of the objectionable ordinance. No such strict time limitation is legislatively prescribed for the formulation of and gathering of signatures for an initiative petition, N.J.S.A. 40:69A-185. Theoretically, in the absence of any direct legislative expression, the process of gathering signatures for an initiative petition could take several years. In the case at bar that process took at least 18 months, and accordingly one of the issues presented is the city clerk's contention that the petition is stale and for that reason must be rejected.
Upon the filing of an initiative petition the municipal clerk has 20 days within which to determine whether the petition is signed by a sufficient number of qualified voters. In actual practice the municipal clerk subcontracts the signature verification process to the county superintendent of elections who by virtue of his office, is also the commissioner of registration. If the petition is insufficient, the municipal clerk must set forth the particulars in which it is defective and promptly notify at least two members of the committee of petitioners. N.J.S.A. 40:69A-187. Within ten days after such notification of insufficiency a supplementary petition may be filed and the municipal clerk has another five days within which to examine and verify the amendments. If the insufficiency persists, no further action shall be taken on the petition. N.J.S.A. 40:69A-188. If the initiative petition is found to be sufficient, the clerk shall submit the same to the municipal council without delay and provision must be made for a public hearing. N.J.S.A. 40:69A-190.
If within 60 days after submission to it the municipal council shall fail to pass the ordinance proposed by the *160 initiative petition, the municipal clerk must submit the ordinance to the voters. N.J.S.A. 40:69A-191. Action by the voters on an ordinance so submitted shall take place at the next general or regular municipal election, provided at least 60 days shall have elapsed from the date of the final rejection of the ordinance by the municipal council or from the expiration of the original 60 days within which the council first had the opportunity to act. In other words, the voters must have a clear 60 days following municipal council action or inaction during which time they may debate and campaign for or against the passage of the ordinance. If no general or municipal election is scheduled to be held within 90 days (and the statute is not clear as to the time from which the 90 days runs), then the council may, in its discretion, provide for a special election. N.J.S.A. 40:69A-192. In the absence of provision by the council for a special election, the submission to the voters is to be at the next general or municipal election, whichever first occurs.
Under the most favorable of circumstances, with all signatures submitted ruled valid, approximately 140 days (shorter if the municipal council rejects the initiated ordinance promptly without using up its allotted 60 days) would have to elapse according to the statutory time periods before the issue could be submitted to the voters. Consequently, the filing by the committee of petitioners on June 6, 1975 made the attainment of the general election date of November 4, 1975 for submission to the voters quite uncertain.
In the instant matter the city clerk, after having delegated the signature verification process to the Essex County Superintendent of Elections, instituted this action one day before the expiration of the 20-day period following the filing of the petitions. He sought additional time to complete his work. Perceiving itself without authority to extend the statutory 20-day signature verification process, this *161 court elected to treat the clerk's complaint as a rejection of the petition and ruled that the committee of petitioners would have a further period of ten days within which to correct deficiencies upon being formally notified by the clerk as to the exact nature and extent of the same.
On August 1, 1974 the committee of petitioners was notified that they had only obtained 7,311 valid signatures, which fell 1,745 short of the 9,056 required. On August 4, 1975 the committee made a supplemental filing of 3,997 additional signatures. On August 8, 1975 the superintendent of elections notified the city clerk that only 1,053 signatures on the supplemental filing were good, and accordingly the clerk notified the committee that they then had 8,364 valid signatures, still 692 short. The committee of petitioners thereupon made oral application to the court for a hearing on the issue of the sufficiency of signatures. The hearing commenced on August 19, 1975.
It appears that the superintendent's office staff undertakes the signature verification process for the municipal clerk on a contractual basis for a fee of $9 an hour per person. The work is not conducted during regular working hours but rather by members of the office staff who work on a volunteer basis prior to 9 A.M. or after 4 P.M. Their work has traditionally been performed in two phases, appropriately enough designated as Phase I and Phase II. Phase I consists of ascertaining the election ward and district for each signature and then of checking out each signature in the applicable election binder book covering the address given on the petition by each signer. If a sufficient number of valid signatures are not attained during the Phase I work, Phase II work is usually undertaken. Phase II consists of the more tedious, time-consuming and laborious work of checking signatures not appearing in the binder book at the address given against voters' lists for the past three years, against active and inactive alphabetical voter card files, and against lists of address transfers, marriages and changes of *162 name, all to determine whether the signer of the petition is a qualified or registered voter irrespective of the address appearing on the petition.
The Phase I check of the initial June 6, 1975 filing was reported by the superintendent's office as having the following result:

 6,747  Good Signatures
 10,059  Not in Binders
 1,250  Signatures Did Not Compare
 453  Duplicates (had signed more than
 one petition)
 674  Out of Town
 915  Illegible
 920  Printed
 ______
 21,018  Total by actual count

The Phase II check involved the further investigation of 3,135 of the 10,059 signatures designated "Not in Binders" (hereinafter N.I.B.) That work was suspended on July 30, 1975 by order of the clerk, acting upon advice received from the city corporation counsel's office that Phase II work was not legally required. At that time 564 signatures out of the 3,135 N.I.B.'s checked were validated, bringing the total good signatures at that point to 7,311, still 1,745 short.
The Phase I check of the supplemental August 4, 1975 filing was reported by the superintendent's office as having the following result:

3,997  Total Signatures on Petitions
1,053  Signatures Appearing to be Okay
2,129  Signatures not in Binders
 182  Signatures of Persons Out of Newark
 93  Signature Did Not Compare
 237  Duplicate Signatures
 123  Illegible Signatures
 40  Printed Signatures which did not Compare
 140  Incomplete Signatures (no such street, no such number)

Adding the 1,053 newly validated signatures to the previous total of 7,311 produced 8,364, still 692 short as above *163 noted. The 2,129 N.I.B.s resulting from the supplemental filing were not further investigated.
At that point in time the city had incurred a cost of $14,080.50 for the verification process for the original filing and $1,830 for the supplemental filing, for a total of $15,910.50. The partial Phase II N.I.B. check of the original petitions required the expenditure of 423 man hours. It was estimated that an additional 800 man hours would be required to complete that check alone and would extend over many days. The superintendent's office had between 8 and 24 employees working overtime on the Phase I process but because of the nature of the Phase II work involving the constant resort to three card files only nine workers could be efficiently utilized. Moreover, the city was faced with a severe budgetary strain and simply did not have available sufficient funds to undertake a complete Phase II project.
It was freely acknowledged by the deputy commissioner of registration that the Phase II N.I.B. check produced a success rate of approximately 15% and that if all 10,059 N.I.B.s of the first filing and 2,129 N.I.B.s of the supplemental filing were given Phase II scrutiny, then and in such event over 1,800 additional valid signatures of qualified voters could be expected  more than enough to put the committee of petitioners over the 9,056 required.
Any consideration of the issues here involved must be undertaken in full recognition of the principle that provisions for initiative and referendum elections must be liberally construed in order to effectuate their purposes and to facilitate and not to hamper the exercise by the voters of the rights thereby granted to them. 42 Am. Jur.2d, Initiative and Referendum, § 5 at 645.
The Faulkner Act was adopted in order to encourage public participation in municipal affairs in the face of normal apathy and lethargy in such matters. * * * The initiative and referendum processes authorized by the act comprise two useful instruments of plebiscite power and provide a means of arousing public interest. *164 Ordinary rules of construction would, of course, dictate that such provisions should be liberally construed. [Sparta Tp. v. Spillane, 125 N.J. Super. 519, 523 (App. Div. 1973)]
Unfortunately, the applicable statutes fail to focus upon the issue of the timeliness of the signature-gathering process for an initiative petition. As we have seen, an identical amount of signatures for a referendum petition must be gathered within 20 days because of the imminence of the effective date of a municipal ordinance under attack. No such urgency is usually present in proposing the adoption of an ordinance. Hence a greater time span for the undertaking should be allowed. Too great a time span, however, may spawn problems rendering the signature verification process an impossible task. In Newark, for example, the urban population is fluid, neighborhoods are torn down to make way for urban redevelopment projects, and petition signers may move out of the municipality. Indeed, over an extended period of time signers may change their views on the need for the proposed ordinance. Therefore, in order to safeguard the vitality of the initiative procedure, signature petitions must be reasonably current and not stale. Here, the drive to gather sufficient signatures took 18 months, a lengthy period of time when compared with the 20-day period allowed for the companion referendum process. Nevertheless, in the absence of an express legislative direction and in view of the liberality to be accorded, this court is reluctant to strike down the initiative petitions as stale or outdated.
In similar fashion, the Faulkner Act fails to address itself to the manner in which the municipal clerk must conduct the signature verification process. Must the verification be confined simply to the facial validity of the signature and given residence of the purported qualified voter, or should the process delve deeper and proceed to the Phase II investigation made necessary because of the fluidity of our urban population and, perhaps, because of the age of the petitions?
*165 Accepting the fact that the Legislature by the adoption of the Faulkner Act intended to encourage voter participation in municipal affairs to the fullest extent possible, then the search to determine the existence of a sufficient number of valid signatures to a petition must also be conducted thoroughly and to the fullest extent possible. A person may be a registered and qualified voter on the day he signs the petition but for a variety of legitimate reasons may not be found under the same address or even name when the validating search is conducted. In order not to foreclose his rights and the rights of other signers, a Phase II N.I.B. search must be undertaken. Had such search been fully undertaken here, the committee's petitions would have been found to contain more than sufficient signatures.
Monetary considerations involving the lack of funding to undertake the complete signature verification process, while of concern in the context of the overall efficient functioning of a municipality, are nevertheless extraneous to this case and cannot be interposed to defeat the basic rights of substantial groups of citizens to freely express themselves at the ballot box. Direct legislation by the people by means of initiative or referendum is as much a part of the governmental function of a Faulkner Act municipality as is its mayor and governing body. Therefore, a municipality is bound to provide adequate funding in its budget to enable the initiative and referendum processes to be effectively exercised.
Finally, the city clerk points out several instances in the petitions involving signatures in the same handwriting and also some nonexistent addresses. No doubt there are spurious or forged entries. To that extent, the member of the committee of petitioners who circulated that particular offending petition and verified that "all signatures appended thereto were made in his presence, and that he believes them to be the genuine signatures of the persons whose names they purport to be" was not completely truthful.
*166 The fact that out of a total submission of some 25,000 signatures only about 40% were found to be valid is indicative of slipshod and sloppy work, either with respect to the effort on the part of the committee or with respect to the verification procedures utilized in the superintendent's office where the work is done under great pressures and on an overtime basis.
Consequently, after hearing all of the evidence, the court cannot say that the entire presentation of the committee was tainted with fraud. To do so would be to disenfranchise those qualified voters whose names happened to be on sheets which contained signatures that were irregular. Qualified voters signing in good faith should not be deprived of their rights because of the incidental fraud of others over whom they have no control. In re Petition of Smith, 114 N.J. Super. 421, 428-429 (App. Div. 1971).
For the foregoing reasons, the initiative petition is deemed to be sufficient and the city clerk is directed, in accordance with the provisions of N.J.S.A. 40:69A-190, to submit the same to the Newark Municipal Council within seven days after the entry of an appropriate order for judgment in this case.